Filed 8/22/24  Estate of Dellarsina CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| Estate of KATHERINE DELLARSINA, Deceased. | D082970 |
| RONALD DELLARSINA, Petitioner and Respondent, v. GAETANO SPINOSA, Objector and Appellant. | (Super. Ct. No. 37-2021-00000194-PR-LA-CTL) |


APPEAL from an order of the Superior Court of San Diego County, Olga Alvarez, Judge.  Affirmed.

Gaetano Spinosa, in pro. per., for Objector and Appellant.

Law Offices of Derek J. Wilson and Derek J. Wilson for Petitioner and Respondent.


Gaetano Spinosa appeals from a probate court order granting a petition filed by Ron Dellarsina as the administrator of his mother Kathy Dellarsina's estate for transfer or return of property under Probate Code section 850.

After an evidentiary hearing, the probate court found that Spinosa had used undue influence to transfer funds out of Kathy's accounts and change the beneficiary on her retirement accounts to himself in the months after she was diagnosed with untreatable cancer and before her death at the age of 81. The court ordered Spinosa to return the funds to Kathy's estate and pay double damages under Probate Code section 859. Finding no error, we affirm the order.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Summary of Evidence*

Ron and Luana Dellarsina are the adult children of the decedent, Kathy. Kathy was divorced from their father. She rented a room from various roommates over the years. Kathy turned 80 in 2018.

According to Ron and Luana, they were not estranged from their mother. Ron saw her every day several times a day at the family restaurant he owned with his father in Santee. After he stopped working at the restaurant in November 2019, he continued to see Kathy there several days a week until he left to travel the country in January 2020. He also saw her at the gym and when they went out together for meals or a movie. Luana likewise had a positive relationship with her mother, saw her several times a month, had her over for holidays, and talked to her on the phone frequently. Kathy's phone was on Luana's phone plan, which Luana paid for every month.

From about 2000 to 2010, Kathy had a boyfriend named Tom whom she visited in Virginia where he lived. She also brought Tom to the family restaurant and family gatherings. Kathy's relationship with Tom ended because he wanted to marry her, but she did not wish to be married again.

According to Ron and Luana, Kathy never lived with Spinosa and seldom mentioned him. Kathy never brought Spinosa to family gatherings or the family restaurant. Kathy never mentioned anything about dating Spinosa or being married to him. Kathy referred to Spinosa as a "friend" and told Ron, "We're just friends." She also told Ron, "I don't have any boyfriends. I don't want to be married."

According to Spinosa, however, he and Kathy were spiritually married in a Christian ceremony in 1996, and they had lived together ever since. They believed in biblical rather than civil marriage. Spinosa asserted that Kathy had been estranged from both of her children since 1995.

Kathy had no assets other than bank accounts, investment accounts, and retirement accounts. She told Luana that she did not want to create a trust or will and had instead named Luana and Ron as the pay-on-death beneficiaries of her accounts.

Kathy had glaucoma and a prosthetic eye. She stopped driving in 2016. By early 2020, she was falling a lot because of her deteriorating eyesight.

Luana spoke to her mother by phone shortly after the onset of the COVID pandemic in March 2020. Kathy said she was going to stay with Spinosa. After the lockdown, however, Luana was unable to get hold of Kathy anymore. Luana did not know where Spinosa lived. She tried calling her mother repeatedly but received no answer. On a few occasions, Spinosa answered Kathy's phone and claimed she was sleeping or at Bible study. He said he was using Kathy's phone because his was broken. According to Luana, however, Kathy did not read the Bible, attend Bible study, or go to church. Spinosa told Luana he would ask Kathy to call her back, but she never did. During these conversations, Luana asked Spinosa for his address so that she could visit Kathy, but Spinosa never gave it to her.

Kathy was diagnosed with liver cancer in late March 2020. The doctors determined that her cancer was untreatable and recommended hospice care. Kathy continued to stay with Spinosa until October 2020. In June, July, and August 2020, Kathy had to go to the emergency room for abdominal pain and drainage of fluid in her legs.

For seven months between March and October 2020, no one ever contacted Kathy's children to inform them of her diagnosis or condition. Ron and Luana did not know their mother had cancer.

On July 1, 2020, Kathy executed a general durable power of attorney form allowing Spinosa to act as her agent in managing and disposing of her property. The document was signed by Kathy and Spinosa. According to Spinosa, Kathy wanted to get her finances in order, but she was not feeling well and did not have the energy to take care of things herself, so she executed the power of attorney form at his suggestion.

In the following months, Spinosa transferred $240,042.56 from Kathy's personal accounts either to himself or into accounts held jointly by Kathy and Spinosa. He also changed the pay-on-death beneficiaries for two of Kathy's retirement accounts totaling $216,010.72 from Kathy's children to himself. According to Spinosa, he made these changes at Kathy's request because she was estranged from her children and did not want anything to go to them.

Kathy's condition deteriorated to the point where she could no longer even walk to the bathroom. Spinosa did everything for her, including cleaning her bottom when she went to the bathroom. He was her sole caregiver 24 hours a day.

On October 6, 2020, Kathy was admitted to a Kaiser hospital and was not expected to live for long. Spinosa finally informed Luana of Kathy's

condition and texted her about the possibility of providing home hospice care at Luana's house.

Luana visited Kathy in the hospital several times before Kathy died on October 13, 2020. Kathy looked skeletal and malnourished. On one of the visits, however, Kathy had a particularly good day. She was able to talk to her siblings on the phone, and she and Luana spoke at length. At some point, she and Luana went over all of Kathy's accounts. That evening, Kathy asked a nurse for something to write with. Kathy later gave Luana a note in her own handwriting. The note said: "Luana, I need you to give [Spinosa] $15,000 from the money that you get." The note also had a line for Spinosa stating: "Please give my mom chain to my daughter, Luana." Luana later asked Spinosa for the chain, but he said he did not know what she was talking about. She also asked him for Kathy's purse, but he said, "You're not getting that."

According to the medical records, Kathy told someone at Kaiser the day after her admission that she wanted Luana to make decisions for her if she became unable to do so herself, but she would also like her "partner" Spinosa to make decisions for her as well. The next day, Kathy said "she wants . . . both daughter and partner, who she refers to as her husband . . . to be her decisionmaker while in the hospital." Kathy said that "her partner is her husband" and that "they are legally married and have been together [for] over 25-plus years."

Spinosa did not visit Kathy in the hospital until the evening before she died, when he threatened to pull Kathy's morphine drip out himself if the hospital did not remove it. At the doctor's recommendation, Kaiser security removed him from the hospital.

5

B. *Probate Court Proceedings*

Ron was appointed as the administrator of Kathy's estate. He filed a petition and amended petition in probate court for an order directing Spinosa to transfer or return the funds taken from Kathy's accounts to her estate under Probate Code section 850.[1] He also alleged that Spinosa had acted in bad faith and sought an additional award of twice the value of the property recovered under Probate Code section 859.

The probate court held a two-day evidentiary hearing on the petition. Spinosa was self-represented on the first day of the hearing but represented by counsel on the second day. Ron, Luana, Spinosa, and several other witnesses testified at the hearing. After the hearing, the parties submitted closing statements in writing.

In June 2023, the probate court issued a minute order granting the petition and making findings of fact. The court found Ron and Luana to be credible and Spinosa not credible. The court concluded that Spinosa and Kathy were not married based on the fact that Spinosa had produced no marriage license, no other evidence supported his testimony that they had a spiritual wedding ceremony, and the children knew Spinosa as a mere acquaintance or friend of their mother's. The court also found that Ron and Luana were not estranged from Kathy before her death.

The court found that Kathy was 81 years old; she was diagnosed with liver cancer in March 2020 with instructions for hospice; she sought medical treatment for abdominal pain and drainage of fluids from her legs in June,

---

[1] Probate Code sections 850 and 856 allow a decedent's personal representative or other interested person to petition the court for an order conveying real property or transferring personal property if the decedent died having a claim to the property, but title to or possession of the property is held by another.

6

July, and August 2020; and no one ever contacted her children regarding her condition. From March 2020 until her death in October 2020, Spinosa cared for Kathy without assistance from anyone else, including bathing her, feeding her, dressing her, and taking her to the doctor. In addition to her cancer, Kathy suffered from glaucoma, failing eyesight, and a prosthetic eye.

The court concluded that Spinosa had unduly influenced Kathy in transferring or withdrawing the funds from her personal accounts and changing the beneficiaries of her retirement accounts. The court applied Welfare and Institutions Code section 15610.70's definition of "undue influence" as "excessive persuasion that causes a person to act or refrain from acting by overcoming that person's free will and results in inequity."

The court relied on the following evidence in making its finding of undue influence: Kathy "was very ill from March 2020 through October 2020 and was vulnerable given her numerous visits to the hospital"; Spinosa "possessed apparent authority as her fiduciary under the DPOA and as her care provider"; Spinosa "controlled who spoke to the decedent and their location (Respondent's home) was unknown"; before June 2020, Spinosa and Kathy "shared only one checking account of $25.00"; Spinosa "acted hastily after June 2020 to transfer decedent's individual accounts into a joint account as well as change beneficiaries on the IRA investments" and "further created a joint Fidelity Investment account"; and "[m]any of the transfers took place shortly before her death."

The court also relied on the testimony of Kathy's children "that their mother's intent was to handle her matters by pay-on-death accounts rather than by will" and concluded that this testimony "was further supported by her note to Luana instructing her to give [Spinosa] $15,000 from her own funds." Moreover, the court found that "there was no evidence here that

7

either child was estranged from decedent warranting the transfer of the funds to [Spinosa]" and that "[t]he consequence of transferring all assets to [Spinosa] results in inequity."

The court concluded that Spinosa "acted in bad faith by transferring funds that belonged to decedent while she was ill and isolated from her family into a joint account for his benefit" and "also acted in bad faith by changing the beneficiaries of her retirement accounts into his name." Based on these findings, the court found that Spinosa was liable for twice the value of the property recovered in addition to the return of the property under Probate Code section 859. The court concluded that the value of the funds transferred out of Kathy's personal bank accounts was $240,042.56 and the value of the retirement accounts for which Spinosa was named as beneficiary in place of her children was $216,010.72. Accordingly, the court directed Spinosa to pay the estate the sum of these two figures ($456,053.28) plus twice that sum ($912,106.56), for a total of $1,368,159.84, plus attorney's fees.

## DISCUSSION

## I

Spinosa first argues that the probate court erred by admitting Kathy's handwritten note into evidence as a testamentary disposition, in violation of Probate Code sections 6110 and 6111 (governing the requirements for a will or holographic will) and in contravention of its own assurance that the document would not be admitted as a will. We disagree with Spinosa's reading of the record.

As Spinosa acknowledges, the probate court expressly stated that the note was not being offered or received as a will when it admitted the document into evidence. Nothing in the record suggests that the probate

8

court later reversed course. The court's final order does not indicate that it treated the handwritten note as a will. Instead, the court cited the note only once as corroboration of Luana's testimony that Kathy intended her children to be the pay-on-death beneficiaries of her accounts. Kathy's handwritten note instructed Luana "to give [Spinosa] $15,000 *from the money that you get*." (Italics added.) As the trial court observed, this note supported Luana's testimony that Kathy intended the children rather than Spinosa to be the beneficiaries of her accounts. The fact that Kathy still had this understanding in October 2020 just days before she died tended to refute Spinosa's testimony that Kathy had instructed him to make sure her children received nothing—and inferentially supports the court's finding of undue influence. The other portion of Kathy's note asking Spinosa to give her "mom chain" to Luana also supported Luana's testimony that she and her mother were not estranged. Thus, the probate court correctly admitted the note for its relevance to disputed factual issues concerning the claim of undue influence.

Spinosa argues that the probate court "permitted" Luana "to express an impermissible opinion as to the decedent's testamentary intent." At the hearing, Ron's counsel asked Luana, "Do you think this note was intended to be her last wishes?" Luana answered, "Yes, it was." But Spinosa made no objection to this testimony, so he has forfeited any claim of evidentiary error on this point. (Evid. Code, § 353; *Estate of Odian* (2006) 145 Cal.App.4th 152, 168.) Moreover, the probate court did not cite or rely on this testimony in its final order and did not make any finding that Kathy intended the note to be a will. Accordingly, the probate court committed no error by admitting and considering the note for reasons other than as a testamentary disposition.

9

## II

Spinosa next argues that the court failed to consider the Kaiser medical records admitted into evidence pertaining to Kathy's mental and emotional status, and thereby failed to properly apply the statutory criteria for adjudication of undue influence claims. We review this issue de novo as a claim of legal error.

Neither party disputes that the probate court was correct in applying the definition of "undue influence" set forth in Welfare and Institutions Code section 15610.70, subdivision (a). This statute defines "undue influence" to mean "excessive persuasion that causes another person to act or refrain from acting by overcoming that person's free will and results in inequity." (*Ibid.*) It further provides that all of the following factors must be considered: (1) the vulnerability of the victim, including incapacity, illness, disability, injury, age, education, impaired cognitive function, emotional distress, isolation, or dependency, and whether the influencer knew or should have known of the alleged victim's vulnerability; (2) the influencer's apparent authority, including his or her status as a fiduciary, family member, or care provider; (3) the actions or tactics used by the influencer, including but not limited to (a) controlling the necessaries of life, medication, the victim's interactions with others, access to information, or sleep, (b) use of affection, intimidation or coercion, (c) initiation of changes in personal or property rights, use of haste or secrecy in effecting those changes, effecting changes at inappropriate times and places, and claims of expertise in effecting changes; and (4) the equity of the result, including the economic consequences to the victim, any divergence from the victim's prior intent or course of conduct or dealing, or the appropriateness of the change in light of the length and nature of the relationship. (*Ibid.*)

10

The probate court properly considered all four of these factors in making its determination of undue influence. As to the victim's vulnerability, the court found that Kathy was 81 years old; she was very ill with metastatic liver cancer; the doctors had recommended hospice care; she suffered from glaucoma and failing eyesight and had a prosthetic eye; she was isolated from her family; and she was dependent on Spinosa for care. As to the influencer's apparent authority, the court found that Spinosa had apparent authority as Kathy's fiduciary under the power of attorney and was her sole care provider for seven months after her diagnosis. As to actions and tactics used by the influencer, the court found that Spinosa did not notify Kathy's children about her condition for seven months; Spinosa controlled who spoke to Kathy and did not disclose the address where she was staying; Spinosa was solely responsible for Kathy's care, including bathing, feeding, and dressing her and taking her to the doctor; Spinosa acted hastily after June 2020 by taking $240,042.56 out of Kathy's personal accounts and either transferring the money to accounts held jointly with Spinosa or directly to himself, and also by changing the beneficiaries on Kathy's retirement accounts worth $216,010.72 from her children to Spinosa; and many of the transfers took place shortly before her death. As to equity, the court found that the consequences of these actions were inequitable because they did not comport with Kathy's previously stated intentions to leave everything to her children; she was not estranged from her children; she was not married to Spinosa; and before June 2020, she had only a single joint account with Spinosa with a balance of $25.00.

Spinosa does not challenge any of the probate court's findings of fact on any of these matters. Nor does he assert there is insufficient evidence to support the probate court's ultimate finding of undue influence. Rather, his

11

only argument on undue influence is that the probate court failed to consider medical records showing that Kathy was alert, oriented, and not under distress.

We see nothing in the record to support this assertion. The mere fact that the probate court did not mention this evidence in its final order does not establish that it failed to consider it. Absent an affirmative showing to the contrary, we must presume that the court considered all the evidence and properly applied the law. (See, e.g., *Jones v. Solgen Construction, LLC* (2024) 99 Cal.App.5th 1178, 1192; *McDermott Will & Emery LLP v. Superior Court* (2017) 10 Cal.App.5th 1083, 1103; Evid. Code, § 664.) A trial court is "not required to mention every arguably pertinent item of evidence before it, let alone explain in minute detail its view of each item." (*Yield Dynamics, Inc. v. TEA Systems Corp.* (2007) 154 Cal.App.4th 547, 565 [appellant's claim that trial court " 'disregarded' " evidence was not supported by court's "failure to refer [to it] in its statement of decision"].) "So far as the record shows, the court listened attentively to all of the testimony—often questioning witnesses or seeking clarification from counsel—and carefully weighed and considered everything before it in reaching a decision." (*Ibid.*) Applying the usual appellate principle that the lower court's order is presumed correct and the burden is on the appellant to demonstrate error, we conclude that Spinosa has not met his burden of showing that the probate court failed to consider the evidence of Kathy's mental condition.

### III

Finally, Spinosa argues there is insufficient evidence of bad faith to support the probate court's award of twice the value of the property recovered under Probate Code section 859. We conclude, however, that no finding of bad faith was required because the probate court made all the findings

12

necessary to establish that Spinosa took Kathy's property through the commission of elder financial abuse by undue influence as defined in section 15610.30, subdivision (a)(3) of the Welfare and Institutions Code. (See *Keading v. Keading* (2021) 60 Cal.App.5th 1115, 1128–1130 (*Keading*) [no separate finding of bad faith required for imposition of Probate Code section 859 double damages under this theory of elder financial abuse].) We also reject Spinosa's argument that there was insufficient evidence he took Kathy's property wrongfully.

In proceedings to recover property belonging to a decedent under Probate Code section 850, Probate Code section 856 allows the probate court to order a transfer or conveyance of the property to the decedent's estate. In addition, Probate Code section 859 authorizes an award of double damages in three specified circumstances. It provides: "If a court finds that a person [1] has in bad faith wrongfully taken, concealed, or disposed of property belonging to a conservatee, a minor, an elder, a dependent adult, a trust, or the estate of a decedent, *or* [2] has taken, concealed, or disposed of the property by the use of undue influence in bad faith *or* [3] through the commission of elder or dependent adult financial abuse, as defined in Section 15610.30 of the Welfare and Institutions Code, the person shall be liable for twice the value of the property recovered by an action under this part."[2]

_____

[2] Though referred to as "double damages" in the case law, the statutory scheme really appears to authorize a form of triple damages when the property taken is money. This is so because it authorizes both the return of the property taken (Prob. Code, § 856) and an additional award of twice the value of the property recovered (Prob. Code, § 859). (See *Estate of Ashlock* (2020) 45 Cal.App.5th 1066, 1074–1075 [hypothetical person who took $10,000 and acted in bad faith would be ordered to return the $10,000 under Probate Code section 856 and pay another $20,000 under Probate Code section 859 (twice the value of the property recovered), for a total of $30,000]; but see *Conservatorship of Ribal* (2019) 31 Cal.App.5th 519, 525 [finding

(Prob. Code, § 859, italics added.) The statute further states: "The remedies provided in this section shall be in addition to any other remedies available in law to a person authorized to bring an action pursuant to this part." (*Ibid.*)

There is a split of authority on whether a finding of bad faith is required for the third category of conduct involving elder or dependent adult financial abuse. The first two courts to consider the issue concluded that no such finding was required for this third category. (*Hill v. Superior Court* (2016) 244 Cal.App.4th 1281, 1287 (*Hill*) ["the last alternative of *section 859* allows for double damages without any requirement that petitioners show any aggravated misconduct—only financial elder abuse" (italics added)]; *Kerley v. Weber* (2018) 27 Cal.App.5th 1187, 1197–1198 (*Kerley*) ["no separate finding of bad faith was necessary" for double damages under the third category].) Another court later disagreed and concluded that bad faith is required to impose double damages even for the third category of financial elder abuse. (*Levin v. Winston-Levin* (2019) 39 Cal.App.5th 1025, 1034–1040.) Most recently, however, a fourth court sided with *Hill* and *Kerley* based on the plain language of the statute. (*Keading, supra*, 60 Cal.App.5th at p. 1128.)

We agree with *Hill*, *Kerley*, and *Keading* on this issue. "The language of Probate Code section 859 is not ambiguous in specifying when a bad faith finding is necessary for double damages." (*Keading, supra*, 60 Cal.App.5th at p. 1128.) "The statutory language contains three different . . . categories of conduct that can support double damages, each of which is separated by the conjunction 'or.' The first two categories require a separate finding of bad faith but the third one . . . does not." (*Id.* at pp. 1128–1129.) Under the third

---

Legislature did not intend to authorize triple damages].) Spinosa has not raised any issue on appeal regarding the amount of damages awarded under Probate Code section 859.

category, therefore, double damages may be awarded without a finding of bad faith if the property was taken, concealed, or disposed of through the commission of elder or dependent adult financial abuse as defined in section 15610.30 of the Welfare and Institutions Code. (*Keading*, at pp. 1128–1130.)

The probate court made all the findings necessary for this third category of conduct. A person commits elder financial abuse when he or she "[t]akes, secretes, appropriates, obtains, or retains, or assists in taking, secreting, appropriating, obtaining, or retaining, real or personal property of an elder . . . by undue influence, as defined in [Welfare and Institutions Code] Section 15610.70." (Welf. & Inst. Code, § 15610.30, subd. (a)(3).) An "elder" is anyone 65 years of age or older. (*Id.*, § 15610.27.) Bad faith or intent to defraud is not required to prove elder financial abuse. (*Stebley v. Litton Loan Servicing, LLP* (2011) 202 Cal.App.4th 522, 527–528.)

As noted, the probate court found that Kathy was 81 years old when the relevant events occurred. It also applied the definition of "undue influence" in Welfare and Institutions Code section 15610.70. Based on this definition, the probate court concluded that Spinosa used undue influence to obtain Kathy's property and change the beneficiary on her retirement accounts to himself. Nothing more was required to establish that Spinosa took or appropriated Kathy's property through the commission of elder financial abuse. Accordingly, even though the probate court made a finding of bad faith, such a finding was not necessary to support its award of double damages under Probate Code section 859. (*Keading, supra*, 60 Cal.App.5th at pp. 1128–1130 [trial court properly imposed double damages under Penal Code section 859 without a finding of bad faith based on undue influence theory of elder financial abuse].) We therefore need not consider Spinosa's argument that there was insufficient evidence of bad faith. (See *Estate of*

15

*Beard* (1999) 71 Cal.App.4th 753, 776–777 [appellate court will affirm if trial court's decision is correct on any theory of law applicable to the case].)

As part of his argument on this issue, Spinosa asserts there is insufficient evidence he took, concealed, or disposed of Kathy's retirement accounts "wrongfully" within the meaning of Probate Code section 859. But the word "wrongfully" appears only in the first of the three categories listed in Probate Code section 859, not the second or third. As to the third category, taking an elder's property by means of undue influence is inherently wrongful because it is prohibited by statute. (Welf. & Inst. Code, § 15610.30, subd. (a)(3).) Viewing the evidence in the light most favorable to the probate court's ruling, it supports a finding that by using undue influence to change the beneficiary on Kathy's retirement accounts to himself even though she intended to leave them to her children—at a time when Kathy was dying from cancer, elderly, dependent on Spinosa for care, vulnerable, and isolated from her family—Spinosa took or disposed of her property wrongfully. Accordingly, we conclude that sufficient evidence supports the probate court's award of double damages under Probate Code section 859.

## DISPOSITION

The order is affirmed. Respondent is entitled to recover his costs on appeal.

BUCHANAN, J.

WE CONCUR:

IRION, Acting P. J.

RUBIN, J.